UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT LEE CLOY,

     Petitioner,     Case No. 1:08-cv-210

v.             Honorable Robert J. Jonker

THOMAS BIRKETT,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

   This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving two concurrent terms of life imprisonment, imposed by the Berrien

County Circuit Court on November 20, 2003, after a jury convicted Petitioner of armed robbery,

MICH. COMP. LAWS § 750.529, and first-degree criminal sexual conduct (CSC I), MICH. COMP.

LAWS § 750.520b. In his *pro se* petition, Petitioner raises seven grounds for relief, as follows:

  I.   DEFENDANT WAS DENIED HIS STATE AND FEDERAL
     CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TR[IA]L BY
     (1) THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL
     EVIDENCE THAT HE WAS THE SUSPECT IN ANOTHER CASE,
     OCCURRING SUBSEQUENTLY TO THIS CASE AND INVOLVING A
     SIMILAR FACT PATTERN AND (2) THE OFFICER'S TESTIMONY
     THAT HE EXERCISED HIS RIGHT TO REMAIN SILENT.

  II.   THE PROSECUTOR DEPRIVED DEFENDANT OF HIS STATE AND
     FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL BY
     ENGAGING IN MISCONDUCT.

  III.  DEFENDANT['S] FEDERAL AND STATE CONSTITUTIONAL RIGHTS
     TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED
     WHERE, FOR THE NUMEROUS REASONS SET FORTH, HE WAS

PREJUDICE[D] BY HIS COUNSEL'S FAILURE TO PERFORM AT AN OBJECTIVE STANDARD OF REASONABLE COMPETENCE.

IV. THE TRIAL COURT VIOLATED DEFENDANT'S DUE PROCESS RIGHTS AT SENTENCING BY SCORING THE STATUTORY SENTENCE GUIDELINE RANGE BASED ON ALLEGED FACTS WHICH THE PROSECUTOR DID NOT CHARGE AND PROVE BEYOND A REASONABLE DOUBT AT TRIAL OR HAVE DEFENDANT ADMIT AT A PLEA.

V. DEFENDANT['']S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED, FOR THE NUMEROUS REASONS SET FORTH(1) COUNSEL['']S FAILURE TO ADEQUATELY INVESTIGATE PARTICULAR EVIDENCE, (2) COUNSEL['']S FAILURE TO ADEQUATELY PREPARE FOR TRIAL, (3) COUNSEL['']S FAILURE TO SEEK [A] CONTINUANCE. DEFENDANT WAS PREJUDICE[D] BY HIS COUNSEL'S FAILURE TO PERFORM AT A[] STANDARD OF REASONABLE COMPETENCE.

VI. DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, WHEN COUNSEL FAIL[ED] TO RAISE ISSUES THAT DEFENDANT EXPRESSLY REQUESTED.

VII. DEFENDANT WAS DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY, WHERE THERE W[ERE] ONLY 3 AFRICAN-AMERICAN[S] IN THE ARRAY FROM WHICH HIS JURY WAS SELECTED, DUE TO THE SYSTEMATIC EXCLUSION OF AFRICAN-AMERICAN RESIDENTS OF THE COUNTY FROM CIRCUIT JURY SERVICE.

(Pet., Attach. C, docket #1-4.)

Respondent has filed an answer to the petition (docket #8) stating that the grounds should be denied because they are noncognizable state law claims which have no merit or they are procedurally defaulted. Upon review and applying the AEDPA standards, I find that all of Petitioner's grounds for habeas relief are procedurally barred and/or without merit. Accordingly, I recommend that the petition be denied.

<u>**Procedural History**</u>

**A.     Trial Court Proceedings**

The state prosecution arose from the armed robbery and sexual assault of Dianne Fernan on December 6, 2001 in St. Joseph, Michigan. Petitioner was charged with CSC I, armed robbery and kidnaping, and, following a preliminary examination on February 5, 2002, he was bound over on all charges. A supplemental information was filed charging petitioner as a habitual offender, third offense. Petitioner was tried before a jury beginning November 19, 2002, and concluding on November 20, 2002.

Dianne Fernan testified that, on December 6, 2001, she left her house at approximately 7:10 a.m. to go to work at IPC Communications. She arrived at about 7:25 a.m., and it was dark outside. Ms. Fernan was driving her husband's car and was not very familiar with it. She was not scheduled to begin work until 8:00, so she got her cigarette case out, thinking she would have a cigarette and listen to the radio. Before she could light her cigarette, she heard a knocking sound at the door. (Tr. I, 304.) She saw a man wearing a hooded sweatshirt that was pulled down over his face. His shirt was up over his mouth and he was wearing work gloves. Because of the way he was dressed, she thought the man was Bill Carley, the maintenance man. (Tr. I, 305.) He motioned for Ms. Fernan to roll down the window, but she could not do so because she would not have been able to roll it up again. She therefore opened the door a crack and said, "Bill, what are you doing[?]," assuming that Bill Carley was playing a joke on her. (Tr. I, 305.) The man opened the door quickly, hit her in the face, pushed her down and told her, "Get down. Get down. I'll kill you. I'll kill you now. Get down. Be quiet. Don't say anything. Keep your head down. I'll kill you. I'll kill you now." (Tr. I, 305-06.) The man kept pushing her until she flipped over the top

of the armrest and into the passenger seat, where she landed with her right hip on the edge of the seat.  (Tr. I, 306.)

The man continued to tell her to be quiet and that he would kill her.  He asked if she had any money, and she told him she had $300.00.  The man located the lights on the vehicle and then backed out of the parking space.  The man told Ms. Fernan not to look at him.  As they went over a speed bump, she felt something poking her and saw it was a double-edged knife.  When the man saw her looking, he yelled at her to get her hands away from him and to sit on her hands.  He again threatened to kill her.  (Tr. I, 307-08.)  She put her hands behind her.  (Tr. I, 309.)  From her position, Ms. Fernan could not see, but paid attention to the turns the car made, knowing the streets in the area.  The car turned right out of the parking lot and went to the corner of Lakeview and Hilltop, where it stopped.  The man turned right at Hilltop and then drove very fast.  (Tr. I, 310.)  He turned into a parking lot that was brightly lit.  (Tr. I, 311.)  After asking about how much money she had, the man also asked, "Do you have an ATM?"  (Tr. I, 311.)  She told him she did not have one.  She asked if she could sit up on the seat because she was going to fall off of it from her existing position.  He told her, "Go ahead and fall then.  I told you not to talk.  Shut up or I'll kill you.  I'll kill you now.  Shut up.  Don't say anything.  Keep your eyes closed.  Don't look at me." (Tr. I, 312.)  He then asked where she had the money.  She told him it was in her purse, which was on the floor of the passenger seat.  (Tr. I, 312.)  The man picked the purse up and then made a right back onto Hilltop, heading east and driving fast.  (Tr. I, 312.)  The man subsequently slowed down and drove slowly quite a ways, stopping the car in an unlit area that she could not identify.  (Tr. I, 313.)  The man kept repeating, "Where's the money?"  (Tr. I, 314.)  She told him it was in an envelope.  He responded, "Shut up.  I told you to shut up.  Don't talk.  I'll kill you.  I'll kill you now.

- 4 -

Where's the money?  Where's the money?"  (Tr. I, 314.)  She told him that, if he gave her the purse, she would show him where the money was.  He eventually hit her on the arm with the purse and told her to find the money with one hand.  (Tr. I, 314.)  She found the envelope and gave it to him.  (Tr. I, 314.)

Ms. Fernan heard the man rip the envelope open.  (Tr. I, 315.)  He then pulled down her leather pants, saying something about the leather.  She thought he wanted the pants.  (Tr. I, 315.)  Then the man reached under her sweater and fondled her left breast.  He told her to get onto her stomach.  She did, causing her knees to be on the floor in front of the seat.  (Tr. I, 315.)  The man took hold of the back of her pants and picked her knees up and put her legs on the seat and told her to put her butt up in the air.  (Tr. I, 317.)  She heard what sounded like the man opening a condom, but she saw nothing, as he had told her to keep her eyes closed.  (Tr. I, 317.)  The man then cut off her underwear and fondled her before putting his penis inside her vagina.  (Tr. I, 318.)  The man asked if she had ever been raped before, and she said, "No."  (Tr. I, 318.)  After a short while, the man pulled out and began fumbling around, saying "I got to do the money."  He then reinserted his penis and stroked for awhile.  He withdrew again and told her, "Don't get out of the car."  She promised she would not.  He then began pulling her leather pants over her boots, finally removing them.  (Tr. I, 318.)  The man reached around Ms. Fernan, pulled the door handle up, and pushed her, telling her to get out.  (Tr. I, 319.)  The man had no glove on, and Ms. Fernan could see from his hand and the sound of his voice that he was a black man.  (Tr. I, 319.)  She did not see any other part of his body.  (Tr. I, 320.)  Ms. Fernan got out of the car and began to back away.  (Tr. I, 319.)  The man sat still for a short while and then began to rock.  She thought he was putting on the leather pants.  She began to worry that he might try to run over her, so she moved a bit closer to the vehicle

so that he would not have room to maneuver. (Tr. I, 320.) The man then backed the car out and took off. She watched until she could no longer see the taillights, and then she began to run toward Hilltop Avenue. (Tr. I, 320-31.) She thought she would be able to stop a car and use a cell phone to get help, but no one stopped. (Tr. I, 321.) She kept going across Hilltop until she reached Lakeview, where she became afraid that he might come back in the car. Because of her fear that he might return, Ms. Fernan began to hide as she moved. She went into the Leco parking lot and traveled down the nearest row of cars. She looked, but could not find a door to get into the building. (Tr. I, 321.) She then climbed over the wall and ran up a grass hill near her workplace, IPC. (Tr. I, 322.) She ran across the parking lot, checking to make sure that her access card was around her neck. (Tr. I, 322.) She reached the door, swiped her card, and entered the building, screaming, "Help me. Help me. Call 911. Please, somebody help me." (Tr. I, 323.) Someone called 911. (Tr. I, 323.)

Someone at IPC put her in an office and gave her a blanket to wrap around herself. Karen Zingero called her husband, at her request. (Tr. I, 323.) The St. Joseph Police Department responded to the call, and Ms. Fernan's husband arrived shortly after. (Tr. I, 323.) The police asked everyone to leave the room. (Tr. I, 323.) The police then asked Ms. Fernan if she knew where the car was. (Tr. I, 324.) She told them that the man had driven away with it. She could not give the license plate number, as she had never driven her husband's car before. (Tr. I, 324.) Her husband spoke up and said that the car was parked right up over the curb in front of the building. (Tr. I, 324.) As she left the building with the police, she saw the car parked facing the wrong way in front of IPC on Colonial Street. (Tr. I, 324-25.) The police took Ms. Fernan to Lakeland Hospital, where she saw both a doctor and a nurse. Hospital personal took various samples to complete a "CSC kit"

(criminal sexual conduct kit).  (Tr. I, 325.)  As a result of the incident, she had bruising and red marks and cuts on her neck and bruises on her thighs.  She also had a cut on her left hip where the man cut off her underwear with a knife.  (Tr. I, 328-29.)  Ms. Fernan identified photographs taken of her injuries.  (Tr. I, 328-29.)  She also identified on a map the path she believes was taken, and identified pictures of the parking lot where she was raped and robbed.  (Tr. I, 332-33.)  She never saw her assailant and could not identify Petitioner as anyone she had ever met.  (Tr. I, 337.)

On cross-examination, Ms. Fernan stated that she did not know how seminal stains got on the car seat, though she noted that her husband had bought the car from a junk yard.  (Tr. I, 340-41.)  The coat Ms. Fernan was wearing was a London Fog suede car-length coat in teal blue with black trim.  (Tr. I, 341.)  Ms. Fernan identified the coat as People's Exhibit 11, which was admitted.  (Tr. I, 342.)  She also testified that, when she arrived at the plant and was not wearing pants, Karen Zingero gave her a coat or sweater to put in front of her.  (Tr. I, 360.)  Ms. Fernan removed her coat and gave it to the police officer at the hospital.  (Tr. I, 360.)  The parties stipulated to the admission of the victim's handwritten statement of facts that was turned over to the investigating police, which stated that the assailant had bitten fingernails.  (Tr. II, 483-84.)

Dianne Fernan's daughter, Megan Fernan, was called to testify on a limited basis.  Megan testified that the car depicted in Exhibit 2 was not her car and she had never driven it prior to the day her mother was assaulted.  (Tr. II, 375-76.)  She had, however, ridden in the vehicle with her parents, sitting in both the front passenger seat and the back seat.  (Tr. II, 381-82.)   She also identified her mother's coat as Exhibit 11, and she denied ever wearing or borrowing the coat.  (Tr. II, 376-77.)  At the time of the assault, Megan drove a red Buick Skylark.  (Tr. II, 378.)  Megan

testified that she frequented Benton Harbor and visited at the homes of male African-American friends, but she had never met Petitioner. (Tr. II, 380.)

City of St. Joseph Police Patrolman Christopher Michael Mendus testified that he was working between 7:30 and 8:00 a.m. on December 6, 2001, when he received a dispatch to proceed to IPC in St. Joseph. (Tr. II, 387.) He was the first officer to respond. He pulled into the parking lot and found a group of people waiting for him. (Tr. II, 387.) Mendus entered the IPC building and found Dianne Fernan in one of the offices. (Tr. II, 388.) Ms. Fernan was very upset, crying and emotional. (Tr. II, 388.) She was wearing a jacket and a sweater, and she had a blanket wrapped around her waist. (Tr. II, 388.) Mendus asked Ms. Fernan what had happened. She reported that she had been raped and her car had been stolen. (Tr. II, 388.) Mendus tried to get more information about the car so that he could put out a message to other officers. (Tr. II, 388.) He did not conduct an extensive interview because there were many people in the office and the victim was upset. (Tr. II, 389.) Mendus drove Ms. Fernan to the Lakeland Hospital Emergency Room. (Tr. II, 389.) At his request, they were placed in an individual room, where he began to interview Ms. Fernan. (Tr. II, 390.) Ms. Fernan's husband also was in the room, and Nurse Tammy Grady was in and out of the room during the questioning. (Tr. II, 390.) At some point Ms. Fernan undressed to put on a hospital gown. Mendus left the room while she disrobed. When he came back in, he gathered the clothing that had been removed. (Tr. II, 390.) Ms. Fernan identified Exhibit 11 as the coat that she had been wearing, which he bagged into a plastic bag. (Tr. II, 391.) He separately bagged the other clothing items. (Tr. II, 391.)

Mendus continued to question Ms. Fernan, and he was subsequently joined by St. Joseph Township Police Officer Arwood. The interview continued after Arwood arrived. (Tr. II,

394.) Mendus testified that a CSC kit was used to collect samples from the vaginal and anal areas, together with any hairs, fibers and semen found. (Tr. II, 394.) Mendus was present while the evidence was collected, as was Officer Arwood, Dr. Stevens, Nurse Grady and the victim's husband, Vince Fernan. (Tr. II, 395.) A hair was found that did not belong to an African-American man. (Tr. II, 396.) He observed bruises and cuts on Ms. Fernan that were consistent with her description of a knife touching her neck and chest. (Tr. II, 397.) At the end of the hospital examination, Mendus handed Arwood all of the property he had collected from Ms. Fernan. (Tr. II, 397.) Arwood placed it in his car and Mendus followed Arwood to the St. Joseph Public Works, where individuals from the Michigan State Police Crime Lab had arrived to examine the vehicle. (Tr. II, 397.) When they arrived, Mendus saw Arwood hand the property over to one of the troopers. (Tr. II, 398.) At that juncture, the only three people who had come into physical contact with the coat were the victim, Mendus and Nurse Grady. (Tr. II, 398.) On cross-examination, Mendus acknowledged that, during his interview of Ms. Fernan, she mentioned seeing dark brown gloves, but did not mention seeing a black man's hand. (Tr. II, 404.) Ms. Fernan told him that she believed the man was African-American based on his dialect. (Tr. II, 402-03.)

St. Joseph Township Police Officer Derrick Arwood testified that he met Officer Mendus at St. Joseph Hospital on a report of a CSC offense. (Tr. II, 411.) He jointly interviewed Ms. Fernan with Officer Mendus. (Tr. II, 411.) He received the bagged clothing from Officer Mendus. (Tr. II, 412.) Before giving the bag to the lab, he sealed the bag. (Tr. II, 412.) He transported the bagged clothing to the Grand Rapids technicians that were at the St. Joseph Public Works inventorying the vehicle. (Tr. II, 413-14.) He never removed the coat from the bag. (Tr. II,

414.)  Officer Arwood testified that he took the photographs of the victim at the hospital.  (Tr. II, 416.)

Registered Nurse Patricia Ann Neal testified that she works at the Lakeland Medical Center.  On January 10, 2002, she completed a CSC kit on Petitioner.  (Tr. II, 420.)  Detectives Dannafel and Russell also were in attendance.  (Tr. II, 420.)  She obtained the requisite specimens, including blood sample, mouth swab, pubic hairs and fibers.  She did not sample seminal fluid.  (Tr. II, 421-22.)  She then sealed the kit and gave it to Detective Russell.  (Tr. II, 422.)

Doug Westrate testified as a latent fingerprint examiner employed by the Michigan State Police.  (Tr. II, 429.)  On December 6, 2002, he was called down to St. Joseph with Troopers Bob May, Jason Sink and Christine Steepleton to process a vehicle that was involved in a criminal sexual assault.  (Tr. II, 431.)  In accordance with procedure, they videotaped and took photos of the outside of the vehicle and then processed the outside for trace evidence, including fingerprints.  After that, they opened the doors and photographed the inside of the vehicle.  They then looked it over for trace evidence and processed the inside for fingerprints.  (Tr. II, 431-32.)  They found no trace evidence on the outside of the vehicle.  On the inside they collected an unwrapped condom, the steering wheel cover, two cigarette packages, two pieces of fabric cut from the driver's seat backrest.  In addition, they collected hairs and fibers from the front seat, a bank bag with miscellaneous papers and envelopes, other papers and envelopes and a bi-fold wallet.  They also collected a number of latent fingerprints.  (Tr. II, 432-33.)  On items taken from the car, they found fingerprint matches to Dianne Fernan, Vincent Fernan and Megan Fernan.  They found no fingerprints belonging to Petitioner.  (Tr. II, 434-35, 443.)  They found no fingerprints at all on the inside of the vehicle itself.  (Tr. II, 443.)

Westrate testified that he received the clothing bags from Officer Arwood, as well as the CSC kit. He sealed the bags. The clothing and CSC kit subsequently were given to the DNA unit for analysis. Westrate kept for print analysis the eyeglasses and a pair of blue boots. (Tr. II, 438.) He never removed the coat from the bag while it was in his possession and he never saw anyone else do so. (Tr. II, 439.)

Lakeland Hospital Nurse Tamara Lynn Grady testified that, on December 6, 2001, she was in the emergency room when Dianne Fernan came in through the back door with a police officer. Ms. Fernan was crying and shaking, had makeup smeared across her face, and had a blanket wrapped around the lower part of her. (Tr. II, 447.) Ms. Fernan was taken to a private exam room. Nurse Grady had Ms. Fernan remove her clothes to put on a hospital gown. Ms. Fernan placed her clothes in a brown paper bag that Grady held open. (Tr. II, 448-49.) Grady never touched the clothes. (Tr. II, 449.) The clothes subsequently were given to the police officer, along with the CSC kit. (Tr. II, 449.) Grady then performed a CSC kit evidence collection on Ms. Fernan. They collected evidence that was consistent with Ms. Fernan's story. (Tr. II, 450.) They found a small puncture wound or abrasion on her chest, where she had reported being touched with a knife. (Tr. II, 450.) Nurse Grady collected swabs from the vaginal and rectal areas, as well as saliva. (Tr. II, 450.) In using a CSC kit, the box is unsealed, evidence is collected and placed in the box, and then the box is resealed and signed by both the examiner and the victim. (Tr. II, 451.) Ms. Fernan remained distraught during the entire examination process, intermittently crying and saying, "I can't believe this has happened to me. I could have died. I almost died. He could have killed me. I just can't believe this has happened to me." (Tr. II, 452.)

Berrien Springs Oronoko Township Police Officer Milton Agay testified that, on January 3, 2002, he was investigating a possible robbery from a female. (Tr. II, 455-56.) During the investigation, he canvassed the gas stations in Berrien Springs on the day of the incident. On the videotape from one station, they found video of an individual present shortly before the incident who was wearing similar clothing to that described by the victim. Agay had still pictures made from the videotape, which he circulated to area police agencies. (Tr. II, 456.) Agay identified People's Exhibit 8 as one of those still photographs. (Tr. II, 456.)

Berrien County Sheriff's Department Detective Milford Russell testified that he received a copy of Exhibit 8. After showing it to other officers, the person was identified as Petitioner, Robert Cloy. (Tr. II, 461.) Russell interviewed Petitioner two days later. Cloy acknowledged that the photograph was of him, and Russell observed Petitioner wearing the same clothes as in the picture. (Tr. II, 461.) Russell obtained a search warrant to obtain DNA samples from Petitioner, and he was present when the warrant was executed. (Tr. II, 462.) Nurse Pattie Neal collected blood, hair and swabs. (Tr. II, 462-63.) The kit was sealed and Russell took the kit back to the Sheriff's Department, where it was placed in an evidence locker overnight. (Tr. II, 463.) Detective Russell identified Petitioner in the courtroom. (Tr. II, 475.)

City of St. Joseph Police Department Detective Dale Easton testified that he became involved in the Fernan assault case only after a separate investigation by the Berrien Springs Oronoko Township Police Department. (Tr. II, 466.) He was shown the photograph admitted as Exhibit 8. (Tr. II, 466.) At the time, Easton did not recognize the man in the picture, but he later learned that the man had been identified as Petitioner. (Tr. II, 467.) Easton was with Detective Russell when Russell interviewed Petitioner, and he worked with Russell in preparing the search

warrant. (Tr. II, 467-68.) At a later point in the investigation, Easton interviewed Dianne Fernan. (Tr. II, 468.) He also accompanied Vincent Fernan to have his blood drawn. (Tr. II, 469.) On cross-examination, Easton acknowledged that Ms. Fernan told him that the man who assaulted her had bitten fingernails. (Tr. II, 472-73.)

While waiting for a witness, Petitioner advised the court that he would not request instructions on the lesser included offenses of unarmed robbery and third-degree criminal sexual conduct. (Tr. II, 479.) During a lunch recess, one of the jurors had a brief social conversation with a former Niles Police Officer Richard Appelget, who was at that time employed with the Berrien County Prosecutor's Office. (Tr. II, 486.) Appelget was unaware that the juror was on jury duty. Both Appelget and the juror were questioned about the content of the conversation. (Tr. II, 486-494.) Defense counsel moved to excuse the juror, on the grounds that, now knowing that Appelget, whom she knew, was with the prosecutor's office, she was at risk of favoring the prosecution. (Tr. II, 494-95.) The court denied the motion as speculative. (Tr. II, 496.)

Michele Ann Marfori, a forensic scientist with the Michigan State Police Grand Rapids Laboratory, testified as an expert in area of serology, DNA analysis and statistical evidence. (Tr. II, 498, 503.) Marfori described DNA sampling, extraction and isolation, amplification, and visualization. (Tr. II, 503-05.) She also described a series of control tests that protocols require be run alongside the sample test in order to determine if any contamination has occurred. Any contamination would be reported. (Tr. II, 508.) All of the controls in this case indicated no contamination in the samples tested. (Tr. II, 520.) Marfoni testified that the case initially was assigned to another analyst, who had serologically processed some of the items, looking for seminal stains. (Tr. II, 508.) When that analyst had a medical emergency, Marfoni took over. She reviewed

all of the items in the CSC kit: vaginal, rectal and oral smears. She also looked at a pair of socks, a bra, undergarments, a sweater and a jacket. (Tr. II, 509.) Marfoni identified as Exhibit 11 a jacket that was in the bag received from the scene investigators. To test the coat for serology, Marfoni broke the seal on the bag and removed the coat. She then took a cloth sample from the back of the coat, returned it to the bag, and resealed it. (Tr. II, 511, 514-15.) The seal had not previously been broken by the prior analyst. (Tr. II, 513.) Marfoni found the presence of a seminal stain on the jacket, using an alternate light source to find fluorescence. (Tr. II, 514.) Looking microscopically, she found sperm cells. (Tr. II, 515.) She found no seminal stains or sperm cells on any of the other clothing items submitted. (Tr. II, 516.) She also tested the unwrapped condom that was submitted, but she found no seminal stains or sperm cells. (Tr. II, 516.)

        In addition, Marfoni performed a serology analysis on cuttings from one of the seats in the vehicle. The cuttings tested positive for acid phosphates and for a semen-specific protein. However, because no sperm cells were present, no DNA test was performed because it would likely have revealed a mixture of some sort. (Tr. II, 517.) She performed DNA tests on all of the items in the CSC kit from Dianne Furnan, on the kit received from Petitioner, and on the blood sample from Vincent Fernan. (Tr. II, 519-20.) Marfoni testified about the DNA analysis chart showing thirteen variables that was included in her report. (Tr. II, 521-24.) She testified that every variable marker from the jacket sample corresponded with Petitioner's sample. (Tr. II, 524.) However, she found that Petitioner was excluded as a contributor to the vaginal swab. (Tr. II, 525.) The DNA from the vaginal swab was consistent with Vincent Fernan, the victim's husband. (Tr. II, 525.) The probability of selecting an unrelated individual with the same DNA profile as the one from the jacket sperm sample was one in 4.1 quadrillion in the Caucasian population, one in 1.7 quadrillion in the

African American population, and one in 239.8 quadrillion in the Hispanic population. (Tr. II, 526-27.)

Following Marfoni's testimony, the prosecution rested its case. (Tr. II, 554.) The defense rested without presenting any witnesses. (Tr. II, 554.)

At the conclusion of trial, on November 20, 2002, the jury found Petitioner guilty of first-degree criminal sexual conduct and armed robbery. (Tr. II, 622) The jury found Petitioner not guilty of kidnaping. (Tr. II, 623.) On December 9, 2002, Petitioner was sentenced to serve two terms of life imprisonment. (Sentencing Transcript, (S. Tr.), 12, docket #18.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on August 25, 2003, raised the first three issues presented in the instant application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #19.) By unpublished opinion issued on May 18, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 1/24/97 Mich. Ct. App. Opinion (MCOA Op.), docket #26.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals, together with a fourth claim that corresponds with his fourth ground for habeas review. By order entered January 31, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #20.)

### C.     Post-conviction relief

Petitioner filed a motion for relief from judgment in the Berrien County Circuit Court, raising the final three issues raised in his habeas petition. On March 9, 2006, the circuit court denied the motion on the merits. Petitioner sought leave to appeal the same issues to the Michigan Court of Appeals, which denied leave to appeal on June 15, 2007 on the grounds that Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). The Michigan Supreme Court denied leave to appeal on the same basis on December 28, 2007.

### **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the

facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit has held that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.    Admission of Prejudicial Evidence

In his first ground for relief, Petitioner contends that he was denied his right to due process in two ways.  First, he contends that the admission of evidence that he was a suspect in another case involving a similar fact pattern was so highly prejudicial as to deprive him of a fair trial.  Second, he contends that the police officer's testimony that Petitioner had exercised his right to remain silent deprived him of his constitutional right to remain silent and was fundamentally unfair.

**A.    Other bad acts**

In addressing Petitioner's claim regarding the admission of evidence of another crime, the Michigan Court of Appeals did not address the constitutional question.  Instead, it focused solely on the reasonableness of the trial court's decision to admit the evidence under MICH. R. EVID. 404(b).  The Court, therefore, will address the constitutional question *de novo*.  *See McKenzie*, 326 F.3d at 727; *Wiggins*, 539 U.S. at 534.

To the extent Petitioner intends to raise a claim under MICH. R. EVID. 404(b), his claim is not cognizable on habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to

deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Petitioner cannot meet this difficult standard. The Supreme Court specifically has recognized that the admission of evidence of uncharged crimes ordinarily does not raise a constitutional issue. In *Lisenba v. California*, 314 U.S. 219 (1941), the Supreme Court held that the states are free under the Fourteenth Amendment to admit evidence of uncharged crimes in criminal cases when relevant to issues such as intent, design, or system. 314 U.S. at 227-28. *See also Estelle*, 502 U.S. 62 (holding that the admission of evidence of other bad acts does not violate due process).

Nor can Petitioner demonstrate that, on the facts of this case, the use of evidence of other bad acts was so extreme and prejudicial that it deprived Petitioner of fundamental fairness. The trial court severely limited the evidence of the other crime for which Petitioner was a suspect, disallowing testimony that the other crime also involved an abduction and rape. The court permitted the prosecutor to reference the offense, which was described only as a "possible robbery of a female" (Tr. II, 455-56), solely to explain why a search warrant was issued to obtain Petitioner's DNA samples. Further, when instructing the jury, the court specifically informed the jury that the evidence related to the other offense

was admitted solely for the purpose of explaining the circumstances under which a search warrant was obtained. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he may be guilty of other bad conduct.

(Tr. II, 598.) Because the admission of other bad acts is itself not constitutionally barred, and because the trial court reasonably limited the evidence and provided an appropriate instruction, admission of the evidence was not fundamentally unfair.

### B. Right to remain silent

Petitioner next asserts that his Fifth Amendment right to remain silent was infringed by a response given by Detective Easton to the prosecutor's question.

Q: All right. Were you present when Mr. Cloy was placed under arrest?

A. Yes, I was.

Q. Was he ever interviewed after he was placed under arrest?

A. *Because of the previous contact with him where [he] had asked for an attorney, I could not interview him because of that.*

Q. Okay. Thank you.

(Tr. II, 470-71 (emphasis added).) The Michigan Court of Appeals analyzed the issue as follows:

Defendant also argues that the prosecutor improperly introduced evidence that defendant asserted his Fifth Amendment right to silence during police questioning. We disagree. This question was not preserved for appellate review. Accordingly, we review this issue for plain error that affected defendant's substantial rights. *People v Carines*, 460 Mich. 750, 763-764; 597 NW2d 130 (1999).

In the present case, a police officer's brief explanation that defendant's earlier request for counsel prevented him from interviewing defendant further was not responsive to the prosecutor's question and did not prejudicially suggest that defendant was hiding the truth. The prosecutor's question was whether the police officer interviewed defendant after his arrest. When the police officer provided the unresponsive explanation, the prosecutor immediately stopped the examination. Unresponsive answers do not usually amount to error. *People v Measles*, 59 Mich App 641, 643; 230 NW2d 10 (1975). Given defense counsel's apparent strategy of

allowing the irrelevant and minimally prejudicial statement to fade into the background, the trial court did not commit plain error by failing to *sua sponte* strike the evidence from the record. Such an act would probably have magnified the importance of the evidence in the jury's mind.

(5/18/04 MCOA Op. at 3, docket #19.)

Petitioner's claim is procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in deciding Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73

F.3d 81, 84 (6th Cir. 1996). Further, the fact that the Michigan Court of Appeals reviewed the issue for plain error that affected Petitioner's substantial rights does not obviate the finding of procedural default. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour*, 224 F.3d at 557; *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

If a petitioner procedurally defaulted his federal claim in state court, he must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In the instant case, Petitioner raises the ineffective assistance of trial counsel as cause excusing his procedural default. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453

(2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of counsel on direct appeal. It therefore was properly exhausted. His claim, however, was found by the Michigan Court of Appeals to be without merit:

> Finally, defendant argues that trial counsel denied him the effective assistance of counsel when he failed to object to the testimony and arguments challenged above. We disagree. Trial counsel did a fine job obtaining separate trials, excluding an inculpatory statement of defendant, limiting the introduction of other-acts evidence to its least prejudicial components, and obtaining an acquittal on a kidnapping count. As for trial counsel's failure to object to the officer's testimony and the prosecutor's closing arguments, defense counsel adeptly avoided punctuating the officer's brief irrelevant testimony and allowed the prosecutor to appear overzealous, discrediting the impetus of the entire investigation. Given the limited record, defendant fails to overcome the strong presumption that trial counsel's actions were incompetence rather than trial strategy [sic].

(MCOA Op. at 4 (citation omitted).)

In reaching its decision, the court of appeals relied upon *People v. Stanaway*, 521 N.W.2d 557, 579 (Mich. 1994), which applied the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's

actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals applied established Supreme Court precedent in evaluating Petitioner's claim of ineffective assistance of counsel, and reasonably concluded that counsel's decision not to object to Easton's statement presumptively was strategic, and the state court reasonably concluded that counsel undoubtedly acted to avoid highlighting the issue for the jury. Any trial attorney can appreciate this strategy. Petitioner therefore has not demonstrated that counsel was ineffective in failing to object. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). As a consequence, his claim is procedurally defaulted.

Even had Petitioner not defaulted his claim, it would not entitle him to relief on habeas review. The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court has stated that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37 (1966). Consistent with *Miranda*, prosecutors may not comment on a defendant's post-arrest silence in their case in chief, on

cross-examination, or in closing arguments. *See Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976); *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002).

Admission of testimony regarding post-arrest silence, of course, may be harmless error. "A witness' testimony mentioning post-arrest silence is harmless error when the reference to the silence was neither made nor elicited by the prosecution, where the prosecutor did not highlight the reference, where the comment did not go to the heart of the defense, where there was no further mention of the silence and there was strong evidence of the defendant's guilt." *Pender v. Davis*, No. 86-6124, 1987 WL 37302, at *1 (6th Cir. May 8, 1987) (citing *United States v. Shaw*, 701 F.2d 367 (5th Cir. 1983)); *see also Stone v. McDaniel*, No. 3:07cv-0480-ECR-RAM, 2009 WL 656349 (D. Nevada Mar. 10, 2009) (reviewing the giving of a nonresponsive answer by a prosecution witness under the harmless error standard).

On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112, 129 S. Ct. 2321, 2328 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. In determining whether the error was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, the record does not suggest that Detective Easton's answer was intentionally elicited by the prosecution. The statement in question was brief and explanatory of the fact that Easton had not interrogated Petitioner at the time of his arrest. In addition, the statement was not the product of intentional prosecutorial misconduct. The answer was not responsive to the question asked, and the prosecutor ceased questioning Easton immediately thereafter. Further, the prosecutor did not highlight the statement during closing argument. Moreover, in the context of the case, the effect of the statement was minimal. The case turned on the jury's belief or disbelief of the DNA evidence. If the jury believed the DNA tests were properly done, the evidence of Petitioner's guilt was overwhelming. Easton's answer did nothing to enhance the credibility of the DNA evidence.

For all these reasons, I therefore recommend that Petitioner's claim be denied.

II.     Prosecutorial Misconduct

In his second ground for habeas relief, Petitioner asserts that he was deprived of his right to due process by the prosecutor's misconduct. He contends that the prosecutor committed misconduct by permitting Easton to testify about Petitioner's invocation of his right to remain silent. He also asserts that the prosecutor improperly appealed to the jurors' sympathy and sense of civic duty. With respect to the latter issue, Petitioner references the following statement made by the prosecutor at the end of his rebuttal argument:

> On the morning of December 6th, Dianne Fernan thought she was going to die. What was taken from her was more than just her purse, her money, her pants. It was her faith in humanity. It was her trust in people. It was here sense of self. No one can put her back in the position [she] was that morning. But you can give her justice.

(Tr. II, 588.) Petitioner also argues that, even if the Court finds that neither of the episodes of misconduct, standing alone, is sufficient to justify relief, it should conclude that, taken together, they deprived him of due process.

The Michigan Court of Appeals concluded that the issue was waived on appeal because Petitioner failed to object at trial:

> Defendant next argues that the prosecutor committed misconduct by introducing the officer's improper testimony and making statements during closing argument that appealed to the juror's sympathy and sense of civic duty. Defendant also argues that the cumulative effect of these errors denied him a fair trial. We disagree. On this record, we do not find that the prosecutor committed any error regarding the other-acts-evidence or the unresponsive answer. While the prosecutor did implore the jury to give the victim "justice" and recounted some of the irrelevant emotional aftermath of the crime, we find no error requiring reversal. We will not reverse based on such misconduct if a timely objection would have procured a limiting instruction which could cure the prejudice. *People v. Stanaway*, 446 Mich 643, 687; 521 NW2d 556 (1994). Such an instruction would have remedied any negative effect of the improper argument in this case.

(MCOA Op. at 3.)

Petitioner's claim is procedurally defaulted. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright*, 433 U.S. at 86-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84. As a consequence, Petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536. As with his claim involving Easton's statement, Petitioner asserts ineffective assistance of counsel as cause excusing his default. However, as previously discussed, the Michigan Court of Appeals rejected his claim of ineffective assistance of counsel, concluding that Petitioner failed to overcome the strong presumption that counsel's failure to object was strategic. As I found before, the court's determination was reasonable. Petitioner therefore has failed to demonstrate cause excusing his procedural default, and his habeas claim therefore is barred.

Moreover, even had Petitioner been entitled to habeas review of his claim, the issue is meritless. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935). The Sixth Circuit "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. 2001) (citing *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir. 1999)).

Petitioner's first claim – that the prosecutor committed misconduct by eliciting Easton's comment on Petitioner's silence – was rejected by the Michigan Court of Appeals. The court concluded that the prosecutor had not intentionally elicited the evidence. Instead, Easton's answer was unresponsive to the question asked by the prosecutor. The court of appeals' factual determination that the answer was unresponsive is entitled to a presumption of correctness. *See Sumner*, 449 U.S. at 546; *Smith*, 888 F.2d at 407 n.4. Petitioner has not even attempted to rebut that

presumption. Moreover, as I previously discussed, Easton's passing statement was harmless. As a consequence, the evidence falls far short of a due process violation.

With respect to Petitioner's second claim, the Michigan Court of Appeals apparently accepted that the prosecutor's appeal to sympathy and civic justice was inappropriate. *See Young*, 407 U.S. at 11-12. The Sixth Circuit has recognized that "[c]losing arguments that encourage juror identification with crime victims are improper." *See Johnson v. Bell*, 525 F.3d 466, 484-85 (6th Cir. 2008) (citing *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005)). The remarks, however, were not sufficiently flagrant to rise to the level of a due process violation, because they were isolated and not part of a series of improper comments. *See Johnson*, 525 F.3d at 484-85 (finding that an appeal to juror sympathy was not flagrant because it was isolated and counsel's other remarks were strictly based on the evidence). Here, notwithstanding the prosecutor's improper invocation of the harm experienced by the victim, the remainder of the prosecutor's conduct throughout trial and during closing argument was entirely proper. The isolated remarks were not "'so egregious as to render the trial fundamentally unfair.'" *Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (quoting *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).[1]

For both reasons, I recommend that Petitioner's second ground for habeas relief be denied.

III.    Ineffective Assistance of Trial Counsel

In his third ground for relief, Petitioner asserts the claim of ineffective assistance of trial counsel raised on direct appeal in the state courts. In addressing whether ineffective assistance

---

[1] I note that Petitioner failed to object or obtain a curative instruction, two factors relevant to the determination of whether prosecutorial misconduct rises to the level of a due process violation. *See, e.g., Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47. While those two factors also mitigate against a finding of a due process violation, in light of Petitioner's claim that his attorney was ineffective, I have not weighed those factors in my analysis.

of counsel could serve as cause excusing Petitioner's procedural default, I already have concluded that the state-court's rejection of the issue constituted a reasonable application of established Supreme Court precedent. For the same reasons, I recommend denial of Petitioner's third ground for habeas review.

IV.     *Blakely* Claim

In his fourth ground for habeas relief, Petitioner argues that he was denied his right to due process when the court made sentencing determinations based on facts that Petitioner did not admit and that a jury did not find beyond a reasonable doubt. Petitioner presumably bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.; and see People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS

§ 769.34(2)).  Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence.  *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*.  *See Blakely,* 542 U.S. at 304-05, 308-09.  The trial court in the present case sentenced Petitioner within the parameters of Michigan's indeterminate sentencing scheme.  It therefore did not violate his Sixth Amendment rights.  *See Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim because *Blakely* does not apply to Michigan's indeterminate sentencing scheme); *see also  Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007); *Pettiway v. Palmer,* No. 1:06-cv-132, 2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*, No. 2:07-cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007); *Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006); *George v. Burt*, No. 2:04-cv-74968, 2006 WL 156396, at *5 (E.D. Mich. Jan. 20, 2006); *Walton v. McKee*, No. 2:04-cv-73695, 2005 WL 1343060, at *3 (E.D. Mich. June 1, 2005).

V.     Ineffective Assistance of Trial and Appellate Counsel

In his fifth and sixth grounds for habeas review, Petitioner raises claims of ineffective assistance of trial and appellate counsel, respectively.  Both claims were raised for the first time on collateral review.   Specifically, Petitioner alleges that trial counsel failed adequately to investigate before trial to learn that the victim had described the coat she was wearing during the assault as blue, whereas the DNA expert described the coat she examined as gray.  Petitioner suggests that the second coat was the one given to the victim when she walked in to her building after the assault. He argues that he has family who worked at the business where the victim was employed and that he had had a sexual relationship with at least one woman who worked there, possibly explaining the DNA.   Petitioner argues that counsel was ineffective for failing to investigate or to seek a continuance when doubt arose at trial about the color of the coat.  In ground six, Petitioner argues that appellate counsel was ineffective in failing to claim on direct appeal that trial counsel was ineffective for failing to further investigate the color of the coat.

Because Petitioner failed to raise his claims on direct appeal, both the court of appeals and the supreme court determined that consideration of the claim was barred by MICH. CT. R. 6.508(D).   Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b).   Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place years thereafter, MICH. CT. R. 6.508(D) was a "firmly

established" procedural rule for purposes of Petitioner's action. *See Luberda v. Trippett*, 211 F.3d 1004, 1007 (6th Cir. 2000); *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998). As a consequence, Petitioner's claim is procedurally defaulted.

As cause excusing his procedural default, Petitioner attempts to raise the ineffective assistance of appellate counsel in failing to raise the claim on direct appeal. In order to excuse his default, Petitioner must show that his appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland*, 466 U.S. 668. *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). As previously discussed, under *Strickland*, the petitioner must prove the following to establish a claim of ineffective assistance of counsel: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See McFarland*, 456 F.3d at 699 (citing *Greer*, 264 F.3d at 676).

Petitioner's claim is frivolous. Although the victim described the coat as blue and the DNA expert described the coat as grey, both witnesses unequivocally identified Exhibit 11 as the coat in question. (Tr. I, 342, Tr. II 391, 510.) As a consequence, any discrepancy in the witnesses' description of the color of the coat was irrelevant, and counsel cannot be faulted for failing to conduct additional investigation or failing to seek a continuance to do so. Further, appellate counsel cannot be faulted for not raising a frivolous claim on appeal. *See Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) ("'appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.'") (quoting *Greer*, 264 F.3d at 676). Petitioner therefore cannot demonstrate

the ineffective assistance of either trial or appellate counsel. His claim is both procedurally defaulted and meritless.

      VI.    <u>Jury Venire</u>

In his seventh habeas ground, Petitioner asserts that he has been denied his constitutional right to have an impartial jury drawn from a fair cross-section of the community. He argues that only three of approximately eighty members of the jury array were African-American and that only one of the twelve members of his final jury were African-American. Because that percentage is substantially below the proportion of African-Americans who live in Berrien County, he argues, his right to a fair and impartial jury was violated.

Petitioner raised his jury venire claim for the first time in his motion for relief from judgment. The Berrien County Circuit Court rejected his claim as both unpreserved and without merit, as follows:

> Defendant alleges that the jury venire was not a fair cross section of the community. Defendant alleges that he requested that his trial attorney make "a verbal objection to the make[-up] of the array of the jury venire." Only three of the initial eighty potential jurors were African American. The transcript shows that Defendant's trial counsel alerted the Court that Defendant wanted some African Americans on the jury. The transcript shows that trial counsel questioned prospective jurors at length about [an]y prejudice they might have because Defendant was an African American male accused of raping a white female. The transcript shows that trial counsel exercised 11 p[er]emptory challenges and ultimately expressed satisfaction with the jury as it sat. Finally, the transcript reveals that trial counsel did not make any further concerns about the racial make up of the jury. Defendant now requests a hearing so that he may establish the second prong of the <u>Duren</u> test.

> Initially, Defendant did not properly preserve his challenge to the jury. Additionally, Defendant has made no offer of proof that he can establish either the second or third prongs of the <u>Duren</u> test. Even if he could ultimately do that in a hearing, Defendant has not alleged that the jury empaneled convicted an actually innocent person. Neither has Defendant alleged that the composition of the jury seriously affected the fairness, integrity, or public reputation of the judicial proceedings, independent of his innocence. As a result, no error has occurred here.

(3/9/06 Cir. Ct. Ord., docket #21.)

First, the claim is procedurally defaulted, as the circuit court expressly relied upon the contemporaneous objection rule and reviewed the claim only for plain error. *See Wainwright*, 433 U.S. at 86-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84. Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485. Petitioner has not attempted to argue either cause or prejudice or that, based on newly discovered evidence, he is actually innocent of the offense. *House*, 547 U.S. at 536 (holding that the miscarriage-of-justice exception can only be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence"). His claim therefore is procedurally barred.[2]

Moreover, in concluding that the claim was without merit, the circuit court reasonably applied established Supreme Court precedent. In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court held that "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from *venires* representative of the community . . . ." *Id.* at 537. In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate three elements: (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). When potential jurors are systematically excluded

---

[2]His claim also is procedurally barred because both the court of appeals and the supreme court denied his applications for leave to appeal on the grounds that he failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).

from the jury pool on the basis of race, structural error occurs. *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986). Structural error is not subject to harmless-error review. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991)).

As the trial court concluded, Petitioner has failed entirely to offer proof of his allegations of underrepresentation of African Americans on the jury, and he failed either to allege or show that any such underrepresentation was caused by a systematic exclusion of the group in the jury-selection process. His fair-cross-section claim therefore is without support.

In sum, I conclude that Petitioner's seventh ground for habeas relief is both procedurally defaulted and without merit.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated: November 30, 2009                    /s/ Hugh W. Brenneman, Jr.
                                            HUGH W. BRENNEMAN, JR.
                                            United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).